DRISCOLL (UNITED STATES v.). See Case No. 14,994.

## Case No. 4,087.

### DRISKELL v. PARISH.

[10 Law Rep. 395; 5 West. Law J. 206.]

Circuit Court, D. Ohio. Nov. Term, 1847.

SLAVERY — ACTION FOR OBSTRUCTING ARREST OF FUGITIVES—PENALTIES—EXAMINATION OF JURORS —PEREMPTORY CHALLENGES.

1. Peremptory challenges of jurors need not be made at the same time, but the parties may alternate.

2. The jury cannot be asked generally, whether their conscientious scruples on the slavery question will prevent them from giving a verdict for the plaintiff, but such a question may be put to the members separately.

3. Where a party charged with obstructing the claimant of fugitive slaves, is proved to have driven the slaves into a house, the door of which he closed against the claimant, it is incompetent for the counsel for the claimant to inquire whither the slaves had been since the door was closed. The alleged act of obstruction was the closing of the door, the effect of the obstruction formed no part of the cause of action.

4. In an action under the statute of February 12, 1793 [1 Stat. 302], containing separate counts for harboring slaves and obstructing claimants, several penalties cannot be recovered for the same act, whatever may be the number of persons affected by the course of the defendant, nor can the same act be separated into distinct charges.

5. Facts stated, which must be established to substantiate the charges of harboring and obstructing.

6. The same act cannot be construed both as a harboring and obstruction.

This was an action of debt brought [by Driskell against Parish] to recover the penalty prescribed by the act of congress of February 12, 1793, respecting "fugitives from justice, and persons escaping from the service of their masters." By the 4th section of this statute, it is provided, that if any person shall knowingly and willingly obstruct or

hinder the claimant of a fugitive slave, his agent or attorney, in seizing or arresting a fugitive from labor, or shall harbor or conceal said fugitive after notice that he or she is a fugitive, such person shall, for either of these offences, forfeit and pay to the claimant the sum of five hundred dollars, in addition to any right of action which the claimant may have for injuries received or other damages. [The case was previously tried at the July term, 1845, but the jury disagreed. See Case No. 4,089.]

H. Stanberry and J. H. Thompson, for plaintiff.

S. P. Chase and J. W. Andrews, for defendant.

Some preliminary questions were raised in regard to the impanelling of jurors, and the court ruled: 1. That the two peremptory challenges of jurors allowed to each party by the Ohio statute, need not be made together, but the parties may alternate—the plaintiff making one challenge, and then waiting for the challenge of the defendant, before he exhausts his other peremptory challenge. 2. That the question cannot be asked of the jury generally, whether the conscientious scruples of any of them are such on the subject of slavery as to prevent them from giving a verdict for the plaintiff, should his case be made out in proof, but that it might be asked of each individual. The court, however, suggested the following as a better form of the question:—"Have you any bias which will prevent you in this case from giving effect to the evidence, and the law as it may be made known to you by the court?" To this the jurors all responded in the negative, and no further objections being taken, were sworn in.

The plaintiff's case rested chiefly on the evidence of Col. Mitchell: "I am acquainted with Peter Driskell, the plaintiff. He lives three quarters of a mile from me, about a quarter of a mile from the river, and about six miles from Maysville, Kentucky. Jane and Harrison Garrison were his slaves, together with four other children of Jane Garrison. On the 26th of October, 1844, I was called upon by Mr. Driskell to go in pursuit of them. They had escaped on the preceding night. We followed them, but a rain coming on soon obliterated all traces of their path, and we who were pursuing returned home. I never saw those slaves afterwards until the 28th of February, 1845. I was then in pursuit of the six slaves, in company with Andrew Jackson Driskell, the son of the plaintiff. On the 26th of February, I saw the boy Bill (one of the slaves,) at Sandusky city, near the tavern where I stayed. I employed a sub-agent, a small boy, to play marbles with Bill, and through him ascertain where all the boys were. I found by this where all were but one. I then employed an Irishman to induce Bill to come to my room at the tavern, told him what he was then to do, and how he was to go immediately after the rest. I had understood that Jane and Harrison Garrison were at Mr. Parrish's, and a little after twelve o'clock on that day I made my way there. Near his house, I met Parrish, defendant. I accosted him, and asked him if a woman calling herself Jane Garrison, and her boy Harrison, were at his house. He said they were. I asked him if I could see them. He replied, if Jane wished it I could do so. We then returned toward the house, and I stood by the gate on the outside, whilst he went in. He came out in a very few minutes, with the woman Jane. She stood on his left hand. She spoke to me as if she recognized me, but she had a defect in her speech, and I will not pretend to recollect what she said. She advanced quickly toward me, however, when Parrish put out his hand and arrested her progress. I, in a short time, asked her for Harrison. She looked at Mr. Parrish in an inquiring way, and he made an assenting motion, I think both with his head and his hand. She then went in the house and brought the boy. He also made a motion to approach me, but Parrish again interposed. I then informed Mr. Parrish that these persons were the slaves of Peter Driskell, of Kentucky, and that I wished to take them. 'By what authority?' My reply was. 'By a power of attorney from Peter Driskell,' laying my hand at the same time on the instrument in my breast pocket. 'You need not show me your power of attorney,' replied Mr. Parrish. 'I want judicial authority for this.' I told him I did not know what judicial authority was, if this was not. I then demanded to arrest them, and he replied that I could not arrest them there, or something to that effect. He then shoved them into the house, went in himself, and closed the door after him, and I bowed and went away. In about fifteen minutes I saw Parrish again, and had some conversation with him. I was trying to arrest two of the other boys." Mr. Stanberry here wished to ask what Parrish said with regard to those other boys, to show, (as he said) that he was aiding in their protection, and by this means, to find the quo animo with which he closed the door as above. This was objected to as belonging to a totally different transaction, and the objection sustained by the court. Mr. Stanberry then wished to ask whether the slaves had been seen since the door was thus closed behind them—to show that "the obstruction had been effectual." This was objected to by counsel for defendant, on the ground that the effect of the obstruction formed no part of the cause of action, which would have been equally complete whether any ultimate results had been produced by the interference or not. The objection was sustained, and the question overruled. Mr. Stanberry then wished to ask whether Mr. Parrish did not afterwards say that the slaves were no longer to be found in his house, which question the

court allowed to be put, and the witness proceeded: "After this conversation, I heard Parrish say the slaves left his house that night. The power of attorney under which I acted is here." (The power was produced, and proved to be authority to Mitchell to arrest the fugitives.)

Cross-examined: "I had been several times in pursuit of these slaves before. When I saw Parrish I said nothing about wanting to arrest the slaves before they came out. Mr. Parrish was afterwards called as a witness in the court-house without my consent. I did not pay much attention to what was asked of him. During the trials there he made a statement of what transpired at the gate. I don't know that I assented to any part of it; I certainly did not to all. I think Parrish admitted I had made the demand, but not that he pushed the woman in the house—there we differ. He may have only waived them in, and immediately closed the door. At the court-house nothing was said of a 'fair trial,' and Mr. Parrish used no other words in the place of 'judicial authority.' I never told Mr. Barbour or any other person that Mr. Parrish had conducted himself in a gentlemanly manner—that I had no reason to complain of him—nor that he had zeal as an abolitionist, but was an honest man. At the last term of this court I did take a walk with Mr. Barbour, to find out how our testimony agreed, and correct myself if I was wrong, but we disagreed soon and parted. I was employed to catch these persons, at $1.25 per day and expenses paid—have no interest in this suit, save the establishment of the principle."

McLEAN, Circuit Justice. This action is brought to recover penalties under the act of congress in relation to fugitives from service. That act has been held to be constitutional, but it is penal in its character, and must be strictly construed. The penalties given by it go to the plaintiff. The defendant is charged with harboring and concealing two fugitive slaves of the plaintiff, and with obstructing their arrest. The declaration contains two counts for harboring and concealing, and two for obstruction; but several penalties cannot be recovered for the same act, whatever be the number of persons harbored, or whose service is obstructed: nor can the same act be separated into distinct charges of harboring and obstructing, and thus be made the foundation for the recovery of distinct penalties. To establish the charge of harboring and concealing there must be satisfactory proof that the defendant, with full knowledge that the persons harbored were slaves escaped from another state, concealed them with intent to elude the vigilance of the master and defeat his claim. To establish the charge of obstruction there must be proof that the plaintiff, in person, or by his authorized agent, attempted to arrest the fugitives, and that the defendant, with the same full knowledge, wilfully obstructed the arrest. The important fact to establish is that Colonel Mitchell attempted to make the arrest. He must have apprized the defendant that these were escaping slaves—that he was authorized to make the arrest, and that he did attempt to make the arrest, and was prevented by the defendant. To secure a fair trial to persons claimed as fugitive slaves, and to insist upon a fair trial in their behalf is laudable: but such efforts should be made in good faith. It is the province of the jury to weigh the evidence. If they are satisfied beyond a reasonable doubt, that the defendant has harbored and concealed the fugitive servants of the plaintiff, and has obstructed their seizure by such acts as the court has defined, they will find for the plaintiff; otherwise they will find for the defendant.

The case was then submitted to the jury. After having been out about an hour, the jury sent a request to the court to define the manner in which their verdict should be given; whether they were obliged to find on all the counts of the declaration, or might give in a verdict as to a part. The court instructed them that the two counts for obstructing related to one offence, and the two counts for harboring to one offence. For each of these offences five hundred dollars can be claimed. The same act cannot be construed both as a harboring and obstructing. There must be two distinct acts to constitute these two offences. If there is but one, the jury must decide whether it is an obstruction or a harboring. The jury then retired, and afterwards returned a verdict for the plaintiff—finding the defendant guilty both of harboring the slaves and obstructing the master. The obstruction consisted in the conduct of Mr. Parrish at the gate; the harboring in permitting the slaves to remain in his house until nightfall—an "intent to elude the vigilance of the master" being inferred. The next morning Messrs. Chase and Andrews moved for a new trial, because the verdict was against evidence.

[NOTE. This case was again tried at the November term, 1849, resulting in a verdict for plaintiff for $500. See Case No. 4,088. Afterwards it was heard on defendant's motion to retax the costs. See Cases Nos. 4,075 and 4,076.]